UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

Case No.

AUTONATION, INC., a Delaware
corporation,

      Plaintiff,

v.

ROBERT MCMANN,

      Defendant.

_____/

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff AutoNation, Inc. ("AutoNation") sues defendant Robert McMann ("Mr. McMann") for injunctive relief, damages and other relief, and says:

## INTRODUCTION

1.     Mr. McMann formerly worked as AutoNation's General Manager at its AutoNation Ford in Littleton, Colorado, ("AN Littleton"). The dealership's address is 8252 South Broadway, Littleton, CO 80122.

2.     Mr. McMann signed a Confidentiality, No-Solicitation / No-Hire and Non-Compete Agreement (the "Non-Compete Agreement") with AutoNation on October 6, 2012 The Non-Compete Agreement is attached hereto as **Exhibit "1"**. Notwithstanding his contractual promises to the contrary, Mr. McMann has accepted employment with an AutoNation competitor, Phil Long Ford Chapel Hills in Colorado Springs, CO as the General Manager. The dealership is located at 1565 Auto Mall Loop, Colorado Springs, CO 80920.

## PARTIES, JURISDICTION AND VENUE

3.      This is an action for injunctive relief and damages. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest, costs and attorneys' fees, and is between parties of different states.

4.      AutoNation is a Delaware corporation qualified to do business in the State of Florida, with its principal place of business in Fort Lauderdale, Florida.

5.      Throughout his employment with AutoNation, Mr. McMann was a resident of Colorado. Mr. McMann is over the age of 18, and upon information and belief, is currently a resident of Highlands Ranch, Colorado, and otherwise *sui juris*.

6.      Venue in this District is proper in this action under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred in this District. Further, Mr. McMann specifically agreed to venue in Broward County, Florida, and waived any objections based upon venue, personal jurisdictions or otherwise to Broward County, Florida as the sole venue for bringing suit with respect to the Non-Compete Agreement on which this action is based (**Exhibit "1"**, ¶ 9).

7.      General personal jurisdiction over Mr. McMann in Florida exists consistent with Fla. Stat. § 48.193 and Amendment XIV to the U.S. Constitution. Mr. McMann has extensive contacts with Florida, including but not necessarily limited to:

        i.      attendance at AutoNation's Retail Leadership Conference ("RLC") in Miami Beach, Florida from February 17, 2016 through February 19, 2016 and in Hollywood, Florida from January 19 through January 21, 2014;

ii.    attendance at AutoNation's General Manager University, ("GMU"), in Fort Lauderdale, Florida on November 5 through November 8, 2012, March 12 through March 15, 2013, May 13 through May 15, 2013, July 15 through July 19, 2013, and November 6 through November 8, 2013;

iii.   as a General Manager, Mr. McMann met at least monthly with regional management within AutoNation to discuss business strategy, including, but not limited to, marketing, expansion and strategic long-range planning;

iv.    Mr. McMann received AutoNation's confidential and proprietary business information, including short and long-term future business targets and objectives from AutoNation's corporate headquarters in Florida;

v.     Mr. McMann received AutoNation's confidential and proprietary business information originating from Florida, including among other things: (1) "Best Practices" policies developed at the corporate (meaning Fort Lauderdale) level representing an aggregation of what AutoNation considers to be the best business strategies and techniques to run vehicle dealerships; (2) "Peer Performance Reports" that contain a detailed breakdown and analysis of dealership operations; (3) financial information discussed in Monthly Operating Review meetings held in various AutoNation divisional locations; (4) Mr. McMann had access to AutoNation's "Dealer Central" website, which contains information regarding advertising and marketing strategies, and plans prepared at AutoNation's corporate headquarters in Florida; and (5) "Compensation Tools Program" that details dealership profitability with reference to

dealership staffing, also prepared at AutoNation's corporate headquarters in Florida;

vi.     Mr. McMann received regular direction and supervision originating from AutoNation's corporate headquarters in Florida. For example, General Field Bulletins (GFBs) provided instruction and direction to Mr. McMann, originated in AutoNation's corporate headquarters, and were routed to Mr. McMann through AutoNation's Colorado district office;

vii.    AutoNation's Division Managers, who were responsible for supervising Mr. McMann, are, to a significant degree, the executors of policy developed and implemented at AutoNation's Florida corporate headquarters;

viii.   Mr. McMann contractually agreed to the state or federal courts of Broward County, Florida as the exclusive venue to resolve disputes arising from various written agreements he signed with AutoNation, including the Non-Compete Agreement on which this action is based (**Exhibit "1"**, at ¶ 9); and

ix.     Mr. McMann specifically acknowledged he reasonably anticipated being required to defend this action in Florida and would not object to the assertion of personal jurisdiction over him in Florida (*Id.*).

8.      Specific personal jurisdiction over Mr. McMann in Florida also exists consistent with Fla. Stat. § 48.193 and Amendment XIV to the U.S. Constitution because he has breached a contract in Florida.

9.      More specifically, pursuant to the terms of his Non-Compete Agreement, within five business (5) days following his separation from employment with AutoNation, Mr. McMann was required to inventory and return to AutoNation's Vice President of Human Resources at its corporate headquarters in Fort Lauderdale, Florida the Confidential Materials and Confidential Information (both as defined in his Non-Compete Agreement) in his possession including hard or digital copies. Mr. McMann has failed to inventory and return these materials as required by his Non-Compete Agreement (**Exhibit "1"**, ¶ 2(b)). Mr. McMann failed to comply with this contractual obligation.

## GENERAL ALLEGATIONS

A.      **AutoNation and the business interests this action seeks to protect.**

10.      AutoNation is engaged in the business of owning and operating more than 350 vehicle dealerships in 16 states. As more fully detailed below, certain high-level personnel, like Mr. McMann, have been provided with AutoNation's valuable and confidential business information, and specialized training as an ongoing investment designed to give AutoNation an advantage over its competitors. A competitor of AutoNation that hires AutoNation employees who were trained under and exposed to the information described above thereby gains an unfair competitive advantage over AutoNation in any market in which the competitor and AutoNation both operate. For this reason, AutoNation offers specific and substantial economic benefits in exchange for agreements not to, among other things, compete with AutoNation.

### 1.      The valuable, confidential business information AutoNation makes available to senior management.

11.      AutoNation spends millions of dollars annually, including substantial professional time gathering, organizing and analyzing valuable and confidential business information from every one of its dealerships regarding sales, service, marketing, information technology, and

finance and operations, and then provides that information to the field through its regional operations. AutoNation uses personnel whose sole job responsibility is to amass, organize and analyze this valuable and confidential business information. AutoNation also conducts regular and specialized field training, and monthly operating review meetings for its management teams regarding the best methods to use this valuable, confidential business information, and to compile it into a form and format readily and easily useable by senior management, like Mr. McMann.

12.     AutoNation has developed Best Practices policies at the corporate level that reflect material derived from every AutoNation dealership nationwide, and therefore represents an aggregation of the best business strategies and techniques to operate automobile dealerships based on AutoNation's own experience, and confidential and proprietary business information. AutoNation's Best Practices materials have substantial economic value and are not publicly available, but were made available to Mr. McMann.

13.     AutoNation has developed Peer Performance Reports that contain a detailed breakdown and analysis of almost every aspect of dealership operations within each AutoNation region. A significant portion of the monthly operating review meetings is devoted to the discussion of the confidential and proprietary information in the Peer Performance Reports and includes: **(a)** a GAAP (Generally Accepted Accounting Principles) summary of revenue and gross profit; **(b)** a SG&A (Selling, General and Administrative Expenses) summary and Operating Income analysis; **(c)** an analysis within the GAAP and SG&A Operating Summaries of fees, finance and insurance gross profits, wholesale and other incentive gross profits, depreciation and amortization expenses, as well as the actual gross revenue; **(d)** detailed information and analysis of budgets; **(e)** analysis of gross revenue, expenses and inventory of the

parts departments; **(f)** analysis of the gross revenue and expenses of the service departments; **(g)** analysis of gross revenue and expenses of the body shop departments; **(h)** selling and overhead expenses; **(i)** advertising expenses, budgets and the media used percentage of ads within each media group (radio, newspaper, television, and billboard), and how advertising budgets will be allocated for each form of media; **(j)** e-commerce advertising expenses, methods, gross costs and rebates; **(k)** a detailed personnel summary for fixed operations; and **(l)** a detailed report and analysis of receivables. AutoNation's Peer Performance Reports materials have substantial economic value and are not publicly available, but were made available to Mr. McMann.

14.     AutoNation has developed Monthly Operating Review Sheets for each dealership within each AutoNation region that provide valuable, confidential business information regarding gross volume of sales, parts, inventory, and additional financial information. The reports also contain detailed market analyses prepared by and for the exclusive use of General Managers within AutoNation markets in carrying out their duties for AutoNation. AutoNation Monthly Operating Review Sheets have substantial economic value and are not publicly available, but were made available to Mr. McMann.

15.     AutoNation has developed a Dealer Central website to which General Managers within AutoNation regional markets have access. This program contains several topics of information that are highly sensitive and treated as confidential by AutoNation. AutoNation's Dealer Central website has substantial economic value and is not publicly available, but was available to Mr. McMann.

16.     AutoNation has developed a Compensation Tools Program that details dealership profitability in comparison to staffing. This would allow a competitor to know what business opportunities AutoNation has targeted based on profit loss/gain, and where unfair opportunities

could exist to exploit those AutoNation figures. AutoNation's Compensation Tools Program has substantial economic value and is not publicly available, but was available to Mr. McMann.

17.     Each of the above-described programs were designed and intended to be for the exclusive use of AutoNation, and to provide General Managers, like Mr. McMann, with valuable and confidential business information that is neither readily available to other persons nor permissibly disseminated to the public.

18.     Each senior manager within AutoNation is privy to the valuable, confidential business information described above, and is encouraged to utilize the information with their management teams. General Managers are also encouraged to implement strategies to improve future operations based on certain confidential reports, and information they receive and review.

### 2.     Other valuable information and specialized training AutoNation provides to General Managers.

19.     Select General Managers and General Sales Managers who are perceived by their regional leadership to possess the qualities needed to become top performing General Managers are invited to attend AutoNation's General Manager University, ("GMU"). Mr. McMann was invited to and did attend GMU.

20.     GMU involves four weeks of classroom learning at AutoNation's corporate headquarters in Fort Lauderdale spread out over the course of a year. Following each week of classes, the General Manager candidates return to their designated dealership where they are expected to apply what they have learned.

21.     The core curriculum at GMU is prepared by subject matter experts at AutoNation and is proprietary to AutoNation.

22.     AutoNation spends considerable time and significant resources training General Managers in the AutoNation method of doing business. General Managers are carefully

mentored within the AutoNation system and receive training as to AutoNation's strategies, attend monthly meetings, and attend periodic meetings at its corporate headquarters in Florida regarding overall company strategy, all at the expense of AutoNation.

23.     All General Managers attend meetings where advertising plans, media pricing campaigns and future media budget plans are discussed in detail.

24.     AutoNation has expended, and continues to expend, tremendous effort and cost to implement and specially train General Managers regarding AutoNation's concepts and strategies for competing in the highly competitive automotive industry. In addition, AutoNation provided Mr. McMann with confidential documents and information as defined in his Non-Compete Agreement.

**B.     Mr. McMann's access to AutoNation's valuable and confidential business information and specialized training.**

25.     Mr. McMann was employed as a General Manager at AN Littleton dealership in Littleton, Colorado when his employment ended.

26.     As an AutoNation General Manager, Mr. McMann had primary responsibility for the operation, control and supervision of the personnel at AutoNation CDJR. Mr. McMann's duties and responsibilities – for which he earned over Two Hundred Thirty Thousand Dollars ($230,000.00) in 2016 – included managing, supervising, controlling and operating AN Littleton. Mr. McMann had primary responsibility for the dealership operations and implementation of AutoNation's Best Practices and Peer Performance Reports.

27.     General Managers within AutoNation's markets typically attend various manufacturer training seminars at the expense of AutoNation.

28.     Mr. McMann was provided with copies of the information discussed at monthly operating review meetings conducted by its Region President. Included in these monthly

meetings were discussions about AutoNation's Best Practices policies and a written monthly Peer Performance Report.

**C.** **Mr. McMann's promises not to compete with AutoNation.**

29.     Mr. McMann signed a Non-Compete Agreement on October 6, 2012 (**Exhibit "1"**).

30.     Restrictive covenants (i.e., non-compete agreements) were implemented by AutoNation for reasons including, but not limited to: **(a)** protection of AutoNation's confidential and proprietary information; **(b)** avoidance of certain damaging practices AutoNation was aware of in the highly competitive and transient vehicle repair industry; **(c)** avoidance of solicitation or attempts to solicit current dealership employees by former employees who had left a dealership; and **(d)** avoidance of unfair competition by former dealership employees against AutoNation in the highly competitive automobile industry pursuant to the defined durational and geographical limits in the non-compete agreements. The Non-Compete Agreement signed by Mr. McMann, as more fully described herein, expressly and unambiguously defines the terms and conditions of the prohibited activities.

31.     Mr. McMann's Non-Compete Agreement precludes him from, among other things, working for any competing automobile dealership within 50 miles from AN Littleton or within 10 miles from any other AutoNation dealership for a period of 12 months immediately following his separation of employment with AutoNation (the "Restricted Area") (**Exhibit "1"**, ¶ 6(a)). Mr. McMann's Non-Compete Agreement also prohibits him from engaging in conduct outside the Restricted Area that is directed into the Restricted Area.

32.     In the event of a breach of a non-compete agreement, and because AutoNation cannot be adequately compensated as a matter of law, the Non-Compete Agreement provides for injunctive relief and other equitable relief, as well as the right to damages (**Exhibit "1"**, ¶ 7).

33.     Despite the express and unambiguous language in the Non-Compete Agreement, Mr. McMann has accepted a position with Phil Long Ford Chapel Hills in Colorado Springs, Colorado, a direct competitor of AutoNation which is located less than 50 miles from AN Littleton.

34.     Mr. McMann's acceptance of employment with Phil Long Ford Chapel Hills is a material breach of the express and unambiguous terms of his Non-Compete Agreement with AutoNation.

35.     All conditions precedent to this action have occurred, have been satisfied or have been waived.

## COUNT I – BREACH OF NON-COMPETE AGREEMENT

36.     AutoNation re-alleges and incorporates by reference the allegations in paragraphs 1 through 35 above as if fully set forth herein.

37.     Unless Mr. McMann is enjoined from directly competing against AutoNation in the automotive industry, AutoNation will suffer immediate and irreparable harm.

38.     AutoNation has no adequate remedy at law to prohibit Mr. McMann from directly competing against AutoNation in the automotive industry.

39.     Mr. McMann has breached the restrictive covenant (i.e., the Non-Compete Agreement) he signed with AutoNation (**Exhibit "1"**).

40.     Because AutoNation cannot be adequately compensated as a matter of law, the Non-Compete Agreement provides for injunctive relief and other equitable relief as well as the

right to damages (*Id.*, ¶ 7).

41.     By signing the Non-Compete Agreement, Mr. McMann acknowledged and agreed to the remedies provided to AutoNation in the event of a breach.

42.     AutoNation has a legitimate business interest in prohibiting Mr. McMann from directly competing with it in the automobile industry.

WHEREFORE, AutoNation respectfully requests that the Court:

a.     enter an injunction ordering Mr. McMann, his agents, servants, employees, employers and attorneys, and all others in active concert or participation with him who receive actual notice thereof by personal service or otherwise, to return all of AutoNation's confidential, proprietary and trade secret information in whatever form, and to provide an inventory to AutoNation of such information;

b.     enter a temporary and permanent injunction enjoining and restraining Mr. McMann, his agents, servants, employees, attorneys and all others in active concert or participation with him who receive actual notice thereof by personal service or otherwise, for a period of one year from:

i.     communicating with or soliciting, or encouraging any other person to communicate with or solicit for employment or in an attempt to conduct business with, any person who is or was, or during said one-year period, a customer, supplier, employee, agent or representative of AutoNation, or any subsidiary or affiliate of AutoNation,

ii.     working directly or indirectly in any capacity for any AutoNation competitor within the Restricted Area or establishing, engaging, owning, managing, operating, controlling, or being a director, officer, employee, salesperson, agent, lender or representative of any business in competition with AutoNation, and

c.      require Mr. McMann to comply with the provisions of the Non-Compete Agreement; enter judgment for damages in favor of AutoNation and against Mr. McMann, in such amount as is proved at trial, together with interest thereon;

d.      pursuant to the Non-Compete Agreement, award to AutoNation its costs and expenses incurred in this action, including reasonable attorneys' fees, appellate fees and disbursements; and

e.      such further relief as this Court deems just, necessary and proper.

Respectfully submitted,

**HODKIN STAGE WARD, PLLC**
Attorneys for Plaintiff
54 SW Boca Raton Blvd
Boca Raton, Florida 33432
Phone: 561.810.1600
Fax:    561.300.2128

Dated: October 25, 2017

By: /s Jon K. Stage
    JON K. STAGE, FBN 779430
    E-mail: jstage@hswlawgroup.com
    Secondary e-mail: dcharise@hswlawgroup.com
    ADAM J. HODKIN, FBN 962597
    E-mail: ahodkin@hswlawgroup.com
    Secondary e-mail: daurand@hswlawgroup.com

# EXHIBIT "1"

## CONFIDENTIALITY, NO-SOLICITATION / NO-HIRE AND NON-COMPETE AGREEMENT – AUTONATION GENERAL MANAGER UNIVERSITY

This CONFIDENTIALITY, NO-SOLICITATION/NO-HIRE, AND NON-COMPETE AGREEMENT ("Agreement") is entered into as of this _6th_ day of _October_, 20_12_ between AutoNation, Inc. (together with its subsidiaries and affiliates, the "Company") and _Robert McMann_ ("Employee").

### - Recitals -

This Agreement is being executed and delivered as consideration for, in connection with, and as a condition precedent to your employment or continued employment with the Company and as part of your acceptance into the Company's General Manager University Program ("GMU Program"). You acknowledge that in connection with your employment with the Company and your participation in the GMU Program, you will have access to certain confidential and proprietary information belonging to the Company and relating to the Company's business operations and will receive specialized training with respect to the Company's business operations, methods, strategies and objectives. The parties wish to confirm certain understandings with respect to such specialized training and confidential and proprietary information, limitations on your engagement in certain businesses that may compete with the Company, and the solicitation and/or hiring of employees and customers of the Company.

### - Terms of Agreement -

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the parties hereto agree as follows:

1. Definitions. The terms below shall have the following meanings when used throughout this Agreement:

   a) "Confidential Materials" shall mean and include, without limitation, all Company files, letters, memoranda, reports, records, computer disks or other computer storage medium, data, models, or any photographic or other tangible materials containing Confidential Information, whether created by the Company, Employee or any other party, and all copies, excerpts and summaries thereof which shall come into the custody or possession of Employee. Confidential Materials include, without limitation, any information provided to Employee as part of the Company's GMU Program.

   b) "Confidential Information" shall mean and include, without limitation, all Company information, whether written or oral, tangible or intangible, of a private, secret, proprietary or confidential nature, of or concerning the Company and its business and operations, including without limitation, any trade secrets or know how, computer software programs in both source code and object code form (including, without limitation, Programs) and any rights relating thereto, information relating to any product (whether actual or proposed), development (including any improvement, advancement or modification thereto), technology, technique, process or methodology, any sales,

promotional or marketing plans, programs, techniques, practices or strategies, any expansion plans (including existing and entry into new geographic and/or product markets), any operational and management guidelines, any corporate and commercial policies, any cost, pricing or other financial data or projections, the identity and background of any customer, prospect or supplier, materials associated with the Company's GMU Program, and any other information which is to be treated as confidential because of any duty of confidentiality owed by the Company to a third party or any other information that the Company may, in the ordinary course of business, possess or use and not release externally without restriction on use or disclosure.

(c) "Programs" shall mean and include, without limitation, ideas, routines, object and source codes, specifications, flowcharts and other material and documentation, together with all information, data and know-how, alterations, corrections, improvements and upgrades thereto.

(d) "Work Product" shall mean and include, without limitation, any and all Company products, designs, works, discoveries, inventions and improvements, and other results of Employee's employment with or engagement by the Company (including without limitation, any Programs), that may be conceived, developed, produced, prepared, created or contributed to (whether at the Company's premises or elsewhere) by the Employee, acting alone or with others, during the period of his/her employment or engagement by the Company (or at any time after the termination of Employee's employment or engagement by the Company if derived from, based upon or relating to any Confidential Information).

2.  Treatment of Confidential Information and Confidential Materials.

    (a) *Ownership and Implied Rights.* Employee acknowledges that all Confidential Information and Confidential Materials, including but not limited to the Confidential Information and Confidential Materials which are provided directly and indirectly to Employee originating from AutoNation's corporate headquarters in Fort Lauderdale, Florida, are and shall remain the exclusive property of the Company and nothing in this Agreement or any document relating to Employee's employment with or engagement by the Company or any course of conduct between the Company and Employee shall be deemed to grant Employee any rights in or to all or any portion of the Confidential Information or Confidential Materials.

        (i) *Use and Disclosure.* Employee agrees that at all times during and after his/her employment or engagement with the Company, Employee shall: (i) hold the Confidential Information and Confidential Materials in confidence and refrain from disclosing the Confidential Information or transmitting any Confidential Materials to any other party; (ii) use the Confidential Information solely in connection with his/her employment with the Company and for no other purpose; (iii) take all precautions necessary to ensure that the Confidential Information and Confidential Materials shall not be, or be permitted to be, shown, copied or disclosed to third parties, without the prior written consent of the Company, and (iv) observe all security policies implemented by the Company from time to time with respect to the Confidential Information and Confidential Materials.

(b) *Employee's Obligation to Return Confidential Materials and Confidential Information to Company's corporate headquarters.* Upon Employee's separation of employment or engagement with the Company for any reason, Employee shall, within no longer than five (5) business days after the separation, inventory and deliver, to the Company Vice President of Human Resources at its corporate headquarters in Fort Lauderdale, Florida, all Confidential Materials and Confidential Information as defined herein (without retaining any copies, extracts or other reproductions (whether in hard copy or electronic form) in whole or in part thereof). Employee agrees that the return of Confidential Materials and Confidential Information along with the detailed inventory as contemplated by this paragraph is a material term of this Agreement, and agrees that time is of the essence with respect to the return of the Confidential Materials and Confidential Information as required by this paragraph.

(c) *Employee's Obligation to pay back GMU tuition under Repayment Agreement.* If Employee, *during* his/her participation in the GMU Program or within the first 24 months following his/her commencement of the GMU Program, voluntarily resigns his/her employment with the Company for any reason or is terminated "for cause", Employee acknowledges that he/she will be obligated to reimburse the Company for all "tuition" (or a portion thereof, as applicable) paid by the Company on behalf of the Employee for his/her participation in the GMU Program, in accordance with the terms of a Repayment Agreement Employee is required to sign separately. All references to "for cause" and "tuition" in this paragraph 2(e) shall incorporate the definitions set forth in the Repayment Agreement as if fully set forth herein. Nothing about this paragraph 2(e) or the Repayment Agreement is intended to limit the Company's remedies if Employee breaches this Agreement.

3. Ownership of Work Product.

a) *Ownership or Rights.* Employee agrees and acknowledges that all (i) Work Product that is conceived, created, designed, developed or contributed by Employee in his/her capacity as an employee or independent contractor of the Company is deemed to be within the scope of his/her employment or engagement and (ii) "works made for hire" under the United States Copyright Act (or other applicable statute), and all worldwide rights, title and interest in and to any and all Work Product, shall be and remain the exclusive property of the Company, free from any legal or equitable claim of right, title or interest which Employee might have in or with respect thereto. Employee shall program into all of the versions of any Programs that are included in the Work Product so that it shall display, in a legible manner, on the computer as part of the first message of each Program the phrase "© 200_ _____", where the first blank is completed by inserting the year in which the Program is completed and the second blank is completed by inserting the name of the Company or any other name designated by the Company.

b) *Assignment of Rights.* Employee acknowledges that all Work Product that is not covered by subparagraph (a) above shall be deemed to have been specifically ordered or commissioned by the Company, and in consideration of the compensation and other benefits provided by the Company to Employee, Employee hereby assigns, transfers and conveys to the Company any and all worldwide right, title and interest that he or she may

have in or to the Work Product, including without limitation, any right, title and interest in or to the Work Product arising under trade secret, copyright, mask work, patent laws or any other laws. During and after the term of Employee's employment or engagement by the Company, Employee shall from time to time and when requested by the Company and at the Company's expense, but without further consideration to Employee: (i) execute all paper and documents and perform all other acts necessary or appropriate, in the sole discretion of the Company, to evidence or further document the Company's ownership of the Work Product and the abovementioned proprietary rights therein, and (ii) assist the Company in obtaining, registering, maintaining and defending for the Company's benefit (which defense shall be at the Company's expense) all patents, copyrights, mask work rights, trade secret rights and other proprietary rights in and to the Work Product in any and all countries as the Company may determine in its sole discretion. Employee agrees that if for any reason he/she fails to fulfill such obligations, the Company may complete and execute any such documents in Employee's name and on his/her behalf.

4. Acknowledgment Regarding Company's Business.

Employee hereby acknowledges that: (i) the Company is as of the date hereof engaged in the sale, advertising, marketing, financing and servicing of new and used vehicles, as well as the provision of related services and products, such as the sale of parts and accessories, extended service contracts, aftermarket automotive products and collision repair services; (ii) the Company may engage in additional related businesses or in separate and distinct businesses from time to time; (iii) the Company currently engages in its businesses by means of traditional retail establishments, the Internet, and otherwise and the Company may in the future engage in its businesses by alternative means; and (iv) Employee's position with the Company is such that he/she is privy to specific trade secrets, confidential information, confidential business lists, confidential records, customer goodwill, specialized training, and employees, any or all of which have great competitive value to the Company.

5. No-Solicitation / No-Hire.

Except to the extent such agreement is prohibited by applicable law, Employee agrees that, for a period of twelve (12) months immediately following the separation of Employee's employment or engagement with the Company, whether the separation is initiated by Employee or the Company for any reason, Employee shall not directly or indirectly: (i) hire, offer to hire, employ, or knowingly permit or cause any company or business directly or indirectly controlled by him/her, or that employs him/her, to hire, offer to hire, or employ, any person who was employed by the Company or any of its subsidiaries or affiliates at or within the then prior six (6) months, or in any manner solicit or seek to induce any such person to leave his/her employment with the Company (including, without limitation, for or on behalf of a subsequent employer of Employee, and even if such individual first approaches Employee or such company or business for employment); (ii) knowingly solicit or induce, through the use of Confidential Information or Confidential Materials, any customers of the Company to patronize any business directly or indirectly in competition with the businesses conducted by the Company or any subsidiary or affiliate of the Company at any time during Employee's relationship with the Company; or (iii) request or advise any person who is a customer or vendor of the Company or any subsidiary or affiliate of the Company or its successors to withdraw, curtail or cancel any such customer's or vendor's business with any such entity.

6. Agreement Not to Compete.

(a) Except to the extent prohibited by applicable law, Employee hereby agrees that he/she shall not during the period commencing on the date hereof and ending twelve (12) months after the separation of Employee's employment or engagement with the Company, whether the separation is initiated by Employee or the Company (for any reason), directly or indirectly, alone or in any other capacity, engage in selling, advertising, marketing, leasing, or servicing of any new or used vehicles or in the wholesale or retail supply of parts with respect thereto, or engage in any additional related or other businesses that the Company or any subsidiary or affiliate of the Company engages in at any time, including by working for, owning an interest in, being associated with or providing services to any company or business (or any subsidiary or affiliate of such company or business) engaged, directly or indirectly, in any of the foregoing activities and including without limitation, by being, acting or engaging as a partner, joint venturer, officer, director, member, employee, consultant, agent, independent contractor, stockholder, landlord or lessor of, or lender to, any company or business or any subsidiary or affiliate of such company or business that is engaged, directly or indirectly, in any of the foregoing activities anywhere (i) within a fifty (50) mile radius of the dealership or office at which Employee is employed by the Company or a subsidiary or affiliate of the Company or (ii) within a ten (10) mile radius of any new or used vehicle dealership owned or operated by the Company or any subsidiary or affiliate of the Company located anywhere in the United States at the time Employee commences to engage in such activity (the geographic areas described in clause (i) and clause (ii) above are referred to herein as the "Restricted Area"); provided, however, that Employee shall not be deemed to have violated the prohibition hereunder merely due to the beneficial ownership of less than one percent (1%) of the shares of stock of any corporation having a class of equity securities actively traded on a national securities exchange or over-the-counter market. The parties acknowledge and agree that this Paragraph 6(a) is intended to encompass any activity or conduct undertaken within the Restricted Area, as well as any activity or conduct directed toward the Restricted Area from outside the Restricted Area, regardless of the actual physical business address or location of Employee at the time the activity or conduct is undertaken. Immediately upon Employee's acceptance of any position in any capacity (including without limitation as a partner, joint venturer, officer, director, member, employee, consultant, agent, independent contractor, stockholder, landlord or lessor of, or lender to, any company or business (or any subsidiary or affiliate thereof), which would constitute selling, leasing, or servicing of any new or used vehicles or in the wholesale or retail supply of parts with respect thereto, whether or not within the Restricted Area), Employee agrees to provide written notice of such acceptance, by facsimile and overnight mail, to the Company's Vice President of Human Resources at the Company's Fort Lauderdale, Florida corporate headquarters. Employee agrees that such written notice is a material term of this Agreement, and agrees that time is of the essence with respect to such notice.

(b) Except to the extent prohibited by applicable law, Employee agrees that, unless Employee first makes written request to, and receives written permission from, the Company's Business Ethics Committee at the Company's Fort Lauderdale, Florida corporate headquarters to engage in such activity (which permission may be withheld in the Committee's absolute and sole discretion), he/she will not, during the period

commencing on the date hereof and ending twelve   (12) months after the separation of Employee's employment or engagement with the Company, whether such separation is initiated by Employee or the Company (for any reason), engage in the following activity in any Restricted Area or in connection with any business located within any  Restricted Area: (i) accept or permit the designation of Employee (or any person or entity in which Employee has an interest or supports or participates in any way) by any automotive manufacturer as an authorized automobile dealer (whether in connection with the establishment of additional dealer representation by such manufacturer or otherwise); (ii) pursue, directly or indirectly (including through any person or entity in which Employee has an interest or supports or participates in any way) a new vehicle franchise for ownership by Employee (or his/her family or affiliates), whether through an acquisition transaction or by means of the submission of an application to an automotive manufacturer for consideration of designation as an authorized automobile dealer by such manufacturer; (iii) execute an agreement to purchase or acquire any automotive franchise for ownership by Employee (or his/her family or affiliates); and (iv) any action in connection with, or related or incidental to, the prohibited actions described in clause (i), clause (ii), or clause (iii) above, whether direct or indirect and whether taken by or for Employee or his/her family or affiliates. The parties acknowledge and agree that this Paragraph 6(b) is intended to encompass any activity or conduct undertaken within the Restricted Area, as well as any activity or conduct directed toward the Restricted Area from outside the Restricted Area, regardless of the actual physical business address or location of Employee at the time the activity or conduct is undertaken.

(c) Except to the extent such agreement is prohibited by applicable law, Employee agrees that he/she will not at any time (whether during Employee's employment or engagement with the Company or thereafter) or at any location (whether in any Restricted Area or otherwise) engage in any of the activities described in clause (i), clause (ii), clause (iii) or clause (iv) of Paragraph 6(b) with respect to any business opportunity (including, without limitation, potential designation as an authorized automobile dealer) that (i) Employee learned or became aware of or was involved in at any time during his/her employment or engagement with the Company or as a result of or in connection with such employment or engagement or (ii) the Company is pursuing as a corporate opportunity.

(d) Except to the extent prohibited by applicable law, and notwithstanding any prior verbal or written understanding or agreement between the parties hereto, Employee's obligations under this Paragraph 6 (including all subparts) shall apply regardless of the circumstances of Employee's separation (including whether such separation is voluntary or otherwise) from the Company.

7. Remedies Upon Breach.

Employee acknowledges that his/her services hereunder are of a special and unique character and place him/her in a position of trust and confidence with the Confidential Information and Confidential Materials and employees of the Company, and that the Confidential Information and Confidential Materials are of a special and unique character that give them a peculiar value, and, as a result, any breach of his/her obligation under this Agreement may cause the Company great and irreparable injury that cannot be adequately compensated solely by the payment of damages in an action at law.  Accordingly, Employee agrees the Company shall be entitled to the

remedies of injunction, specific performance and other equitable relief to redress any breach, or to prevent any threatened breach (and the Company shall not be required to post any bond or prove special damages) and Employee shall pay any and all costs and expenses (included reasonable attorneys' fees and expenses) incurred by the Company in enforcing its rights hereunder. Nothing contained in this Agreement shall, however, be construed as a waiver by the Company of any other right, including, without limitation, the Company's right to monetary damages.

8. Assignment.

Employee hereby consents to the assignment, without additional notice, of his/her obligations under this Agreement, to any of the Company's subsidiaries or affiliates, any successor to the Company or any of its subsidiaries or affiliates or any franchisee of it or any of its subsidiaries or affiliates. Employee may not assign any of his/her rights or obligations under this Agreement.

9. Governing Law; Venue for Legal Proceedings; Employee's Agreement to Jurisdiction.

This Agreement will be governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflict of laws. The parties agree that any action, suit or proceeding, including but not limited to any proceeding for declaratory relief, arising out of or relative to this Agreement or the relationship of Employee and Company shall be instituted only in the state or federal courts located in Broward County, in the state of Florida, and each party waives any objection (including objections regarding lack of personal jurisdiction and objections to the convenience of the forum) which such party may now or hereafter have to such venue or jurisdiction in any action, suit, or proceeding. Employee hereby specifically consents to appear in the state and federal courts of the State of Florida and agrees that this Agreement as well such other additional contact Employee has had with the State of Florida are sufficient to provide Employee notice that the state or federal courts located in Broward County, in the State of Florida, will be the forum for any action, suit or proceeding arising out of or relative to this Agreement. Any and all service of process and any other notice in any such action, suit or proceeding shall be effective against any party if given by mail (registered or certified where possible, return receipt requested), postage prepaid, mailed to such party at the address set forth herein. Employee also agrees that all documents Employee has executed or will execute in the future and all policies and procedures of the Company in connection with Employee's employment relationship with the Company are governed by the laws of the State of Florida.

10. Waiver; Severability.

The obligations of Employee under this Agreement shall survive termination of Employee's employment or engagement by the Company. Any failure on the part of the Company to insist upon the performance of this Agreement or any part hereof shall not constitute a waiver of any right under this Agreement. No waiver of any provision of this Agreement shall be effective unless in writing and executed by the party waiving the right. The parties agree that the covenants included in this Agreement are, taken as a whole, reasonable in their duration and scope and necessary to protect the present and prospective interests of the Company, and it is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under law and equity where enforcement is sought. If any such provision, or any part thereof, is held by a court in a judicial proceeding to be unenforceable

because of the duration of such provision or the scope or area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision, and/or to delete specific words or phrases to the extent necessary to permit the remaining covenants to be enforced, and in its reduced form, such provision shall then be enforceable and shall be enforced.

11. Integration.

This Agreement, together with the offer letter to participate in the GMU program and the Repayment Agreement, supersedes all prior agreements and understandings between the company and the Employee relating to the subject matter hereof, whether oral or otherwise. No party is entering into this Agreement based on any representation not reflected in this Agreement, the offer letter or the Repayment Agreement.

12. Interpretation.

Other than as expressly provided herein, this Agreement is not intended to (and shall not be deemed to) limit, decrease or reduce the scope of any prior restrictive covenants contained in any agreement to which the Company (or any of its subsidiaries or affiliates) and Employee are party (including, without limitation, any employment agreement, stock option agreement or any agreement providing for a business combination or acquisition), including, without limitation, any non-competition, confidentiality, no-hire, no-solicit or similar provisions. To the extent that this Agreement contains any restrictive covenants that are broader in scope than the provisions of any such prior agreement, the terms of this Agreement are intended to control and shall be in full force and effect and fully enforceable by the Company in addition to the provisions of such prior agreement. To the extent that this Agreement contains any restrictive covenants that are narrower in scope than the provisions of any such prior agreement, the terms of the prior agreement are intended to control and shall remain in full force and effect and shall be fully enforceable against Employee in addition to the restrictive covenants contained herein.

13. Applicability.

Employee acknowledges that this Agreement does not create any obligation on the Company to continue to engage Employee for any period. Employee agrees Employee's employment or engagement by the Company is strictly "at will" and Employee hereby acknowledges and agrees that the execution and performance of this Agreement does not constitute a promise or contract of continued employment or engagement. Employee further acknowledges that neither the offer to participate in the GMU program nor any participation in the GMU Program constitutes a promise or agreement to promote or transfer Employee to a general manager position or any other position with the Company at any time in the future. This Agreement is ancillary to the employment or engagement of Employee with the Company and does not define all the terms and conditions of that engagement, including, but not limited to compensation. This Agreement shall not merge into, but shall survive any subsequent contract, agreement or deed unless otherwise expressly provided therein.

**THE COMPANY**

By: _____

Name: _____

As (Title):_____

Date: _____

**EMPLOYEE**

Signature: _Robt McMann_

Name: _Robert McMann_

SS#: ████ ██ _4074_

Date: _10/6/2012_